SPINELLI, DONALD & NOTT
A Professional Corporation
815 S Street, Second Floor
Sacramento, CA 95811
Telephone: (916) 448-7888
Facsimile:  (916) 448-6888

*Amanda Uhrhammer, SBN 199445*
ATTORNEYS FOR MARY BETH FAULKNER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY BETH FAULKNER<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; THE HARTFORD; THE HARTFORD FINANCIAL SERVICES GROUP, INC.; PRICEWATERHOUSECOOPERS, LLP; AND DOES 1 TO 20 INCLUSIVE.<br><br>Defendants.                    / | CASE NO:<br><br>**COMPLAINT**<br>[ERISA 29 U.S.C. 1132 et seq.] |

I.

**JURISDICTION**

Jurisdiction is conferred on this Court by 28 U.S.C. §1331, which provides for original jurisdiction in this Court for actions arising under 29 U.S.C. §1132.

///

///

SPINELLI, DONALD & NOTT

## II.

## VENUE

Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. §1391(b), in which jurisdiction Plaintiff resides and all Defendants regularly.

## III.

## PARTIES

1.   Plaintiff, MARY BETH FAULKNER, is and was at all relevant times an individual residing in the county of Sacramento, California.

2.   Defendant, HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY (hereinafter referred to as HARTFORD), is and was at all relevant times a corporation doing business authorized under the California Insurance Code and the Employee Retirement Insurance Security Act (ERISA). HARTFORD is and was at all relevant times located primarily in the state of Connecticut, but is authorized to and did conduct business in the state of California. HARTFORD is and was at all relevant times a claims review fiduciary with regard to long-term disability insurance policy number GLT 673035 (hereinafter the LTD Plan). THE HARTFORD is a wholly owned subsidiary of THE HARTFORD FINANCIAL SERVICES GROUP, INC..

3.   Defendant, THE HARTFORD (hereinafter referred collectively with all the Hartford Defendants as HARTFORD), is and was at all relevant times a corporation doing business authorized under the California Insurance Code and the Employee Retirement Insurance Security Act (ERISA). HARTFORD is and was at all relevant times located primarily in the state of Connecticut, but is authorized to and did conduct business in the state of California. THE HARTFORD is a wholly owned subsidiary of THE HARTFORD FINANCIAL SERVICES GROUP, INC..

4. Defendant, THE HARTFORD FINANCIAL SERVICES GROUP, INC. (hereinafter referred to as HARTFORD collectively with the other HARTFORD defendants), is and was at all relevant times the parent company of THE HARTFORD and THE HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and is authorized to and did conduct business in the state of California.

5. Defendant, PRICEWATERHOUSECOOPERS, LLP, (hereinafter referred to as PWC), is and was at all relevant times, a Delaware limited liability partnership but which conducted business in Sacramento, California. PWC was, at all relevant times, the policy holder of the subject long-term disability insurance policy and sponsor of the long-term disability insurance policy number GLT 673035 (hereinafter referred to as the LTD Plan.).

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

6. Plaintiff MARY BETH FAULKNER was covered by a long-term disability policy obtained through her employer, Defendant PricewaterhouseCoopers LLP (hereinafter PWC), and Defendants The Hartford Insurance Company, The Hartford Insurance Group and Hartford Life and Accident Insurance. PWC was the policyholder and sponsor of the subject Plan.

7. At all relevant times, plaintiff was employed with PWC as a Tax Manager.

8. Plaintiff is informed and believes that HARTFORD was the insurer of the LTD Plan and fully responsible for the payment of any benefit claims under the plan as the claims review fiduciary. HARTFORD also had the "responsibility of fiduciary for the provision of full and fair review of denials pursuant to Section 503 of ERISA," according to the Schedule of Insurance.

9. Plaintiff is informed and believes that, under the LTD Plan provisions, PWC had the obligation to appoint a Plan Administrator. Plaintiff is informed and believes that PWC appointed HARTFORD as the Plan Administrator. Therefore, HARTFORD, was both responsible for

1  determining eligibility to receive benefits and financially responsible for the payment of said
2  claims.
3     10.    On or around the May 19, 1002, Plaintiff was bitten by a tick during a trip to
4  Maryland. Shortly thereafter, she developed a bull's eye rash on her left. Approximately 7-10 days
5  later, Plaintiff began experiencing right facial weakness. She was diagnosed with Lyme disease and
6  was treated with anti-biotics.
7
8     11.    In or around August of 2001, Plaintiff returned to work but was placed back on
9  medical leave after less than a month due to severe fatigue, diffuse arthralgias, intermittent vertigo,
10 joint pain and tinnitus.
11    12.    Dr. Green, Plaintiff's primary treating physician is a specialist in the diagnosis and
12 treatment of Lyme disease and Babesiosis. Dr. Green diagnosed Plaintiff with late Lyme disease,
13 babesiosis, encephalopathy and fibromyalgia secondary to neuroborreliosis. Plaintiff had tests
14 conducted which were, at times, throughout her treatment, positive for Lyme Disease and Babeosis.
15
16 Plaintiff was also clinically diagnosed with Lyme Disease, Babeosis, and sequelae clinically by
17 several physicians, even in the absence of positive lab results.
18    13.    Plaintiff was unable to retain her position at PWC with this 12-hour/wk limitation as
19 PWC demanded a minimum of 20-hours/wk..
20    14.    Plaintiff volunteered part time, in 2004, at the California Lyme Disease Association
21 which permitted her to work when she wanted and provided her the flexibility to return home to rest
22
23 when needed.
24    15.    By 2005, plaintiff was improving and averaging 5-7 hours/week, while occasionally
25 being able to work 10 hours/week.
26    16.    In 2006, Plaintiff was able to work 12-hours/week, on occasion up to 18 hours/week
27 with her doctor's approval, during the tax season for Campbell, Benn and Taylor during the time
28

SPINELLI, DONALD
& NOTT

periods of approximately March 7, 2006-April 13, 2006 and June 7, 2006 and October 12, 2006. Her employer permitted her flexible hours and the ability to take breaks to rest when needed. During this time period, plaintiff was periodically able to work 12-hours/week, but for the most part, she was unable to sustain that work schedule.

17. In 2007, Campbell, Benn and Taylor moved their offices, extending the commute for Plaintiff to 45-60 minutes. This drive, in conjunction with the work day, was too fatiguing for Plaintiff, and she was unable to continue working there.

18. In October 15, 2007, plaintiff delivered her son. This delivery was very difficult and resulted in a set back with regard to the Lyme disease and she suffered increased symptoms of fatigue, arthralgia, and weakness such that her parents assisted her in her home for 4 months following the delivery of her child.

19. Since late 2008 into 2009, Plaintiff had been attempting to build her stamina to attempt to return to work.

20. Plaintiff continues to treat with Dr. Green.

21. After Plaintiff's Short Term Disability benefits, also through HARTFORD, were exhausted, HARTFORD approved benefits during the "own occupation" period, finding Plaintiff to be totally disabled from her "own occupation" on or about January 3, 2002.

22. The LTD plan document defines "disability or disabled" as follows: "Disability or disabled means that during the Elimination Period and for the next 60 months, You are prevented by :

    1. accidental bodily injury;

    2. sickness;

    3. Mental Illness;

    4. Substance Abuse; or

SPINELLI, DONALD
& NOTT

5

5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result Your Current Monthly Earnings are no more than 80% of Your Indexed Pre-Disability Earnings.

After that, You must be so prevented from performing one or more of the Essential Duties of Any Occupation."

23. As set forth in the Plan Document, "Essential Duty" means a duty that:

1. is substantial, not incidental;

2. is fundamental or inherent to the occupation; and

3. cannot be reasonably omitted or changed.

***To be at work for the number of hours in Your regularly scheduled workweek is also an Essential Duty."*** (Emphasis added.)

24. Plaintiff's primary care physician, Dr. Mo, who treated Plaintiff before May of 2001 and thereafter until Dr. Green took over her care, when she began suffering from her illness, has opined, during the claims process, that Plaintiff was unable to work more than 12-18 hours a week and no more than 6 hours per day due to severe fatigue, vertigo and cognitive difficulties.

25. Pursuant to the requirement of the long-term disability plan and per the request of HARTFORD, Plaintiff applied for, and was, with the assistance of HARTFORD, ultimately approved for Social Security Benefits which she first received in December of 2003, retroactive to April 2002.

26. Given the retroactive nature of the Social Security payment, Plaintiff incurred an overpayment of LTD benefits from the HARTFORD. She was notified of the overpayment, and paid it back to HARTFORD in full in the amount of $33,621.00.

27. Plaintiff continued to receive long-term disability benefits pursuant to the Plan's "own occupation" disability provisions until approximately January 2, 2007. At that point, Plaintiff was required to show, under the LTD Plan, that she was disabled from "any occupation."

28. Plaintiff was notified of her obligation to provide support for her position that she was disabled from any occupation in order to continue to receive benefits under the Plan on or about August 31, 2006. Plaintiff complied.

29. On or about January 11, 2007, Plaintiff was notified by HARTFORD that she qualified for continued benefits under the "any occupation" definition of disability contained in the Plan.

30. Less than six months later, on or about June 8, 2007, HARTFORD wrote to Plaintiff indicating that they needed "interim medical information about [her] disability for [their] claim records."

31. On or about August 1, 2007, HARTFORD contacted Plaintiff's treating physician, Dr. Green, directly, seeking medical records regarding Plaintiff from December 2006 forward.

32. Dr. Green provided her records as requested shortly thereafter.

33. On or about November 13, 2007, HARTFORD again contacted Plaintiff seeking "new information about [her] disability for [their] claim records." They also sought information about any additional income Plaintiff may have been receiving.

34. Plaintiff provided the requested information shortly thereafter, in approximately January of 2008, including updated information about Social Security Disability benefits she was receiving. Plaintiff continued to qualify and receive benefits.

35. On or about January 22, 2008, HARTFORD notified Plaintiff that, based upon the information provided to them by her, she had been overpaid LTD benefits in the amount of $1,830.00. HARTFORD indicated that they would simply withhold that amount from her next

benefit check until the overpayment was paid back in full.

36. On or about September 4, 2008, Plaintiff was again asked by HARTFORD to provide medical and income information regarding her disability for their claim file. This information was provided by Plaintiff in or around October 2008. Plaintiff's treating physicians also provided the information requested.

37. On or about December 1, 2008, Dr. Green was asked by HARTFORD to evaluate Plaintiff's "current functionality for returning to work on a full-time basis."

38. On or about December 18, 2008. HARTFORD ordered surveillance to be conducted of Plaintiff. There is no indication in the claim file that the surveillance yielded any information to support a finding of no disability.

39. On or about February 17, 2009, a medical evaluation, termed an IME in the claim file, was scheduled for Plaintiff to be examined by Dr. Michael Cohen, M.D..

40. On February 29, 2009, Dr. Green responded to the request for information from HARTFORD. By way of letter, Dr. Green opined that Plaintiff remained unable to work in her own occupation or any other occupation on a full-time basis. Dr. Green indicated that Plaintiff would be unable to sit for six (6) hours together as she was spending 12-16 hours a day in a recumbent position and required 12 hours of sleep daily to remain alert and active enough to care for her child. Plaintiff was never notified by HARTFORD that they were having difficulty obtaining needed information from her treating physician.

41. On March 16, 2009, Plaintiff was seen by Dr. Michael Cohen, M.D. at HARTFORD's demand.

42. Dr. Cohen is not a specialist in the area of Lyme Disease or infectious diseases. He stated that it was unclear whether Plaintiff was suffering from chronic fatigue syndrome or an infectious process, but he opined that it was unlikely she would fully recover. He opined that there

was no objective finding to support total disability. Dr. Cohen took one hour to review 1.5" of medical records and spent little time with Plaintiff during the examination.

43. On or about April 1, 2009, the report of Dr. Cohen was forwarded to Dr. Green for comment. Dr. Green responded on or about April 19, 2009, disagreeing with Dr. Cohens's findings and, among other opinions, recommending that a neuropsychological exam be performed out of fairness to Plaintiff. She pointed out Dr. Cohen's lack of any treating history with regard to Plaintiff and his apparent lack of credentials and understanding of Lyme disease and associated conditions. Dr. Green also enclosed significant literary references regarding Lyme disease and associated conditions supporting her opinions that Plaintiff remained disabled and supporting her treatment course of Plaintiff.

44. HARTFORD, on or about May 26, 2009, scheduled a neuropsychological examination of Plaintiff with Dr. Michael Mekjian, Ph.D..

45. On or about June 23, 2009, Plaintiff was evaluated by Dr. Mekjian, Ph.D.. Dr. Mekjian found that Plaintiff was not "functioning up to her fullest neurocognitive potential...and shows intermittent lapses in cognitive processing capacities which appear to be secondary to fatigue effects...". He continued to opine that, "Ms. Faulkner does exhibit mild to at times more moderate underlying psychological and emotional distress which, in part, also contributes to cognitive processing difficulties...." Although Dr. Mekjian opined that Plaintiff's conditions were not severe enough to render her "Totally Temporarily Disabled" on either a neuropsychiatric or psychiatric basis...*Ms. Faulkner's fatigue levels clearly have a negative impact on her overall neurocognitive processing capacities, her psychological and emotional well-being, and her general activities of daily living which in turn would most likely carry over into the workplace in terms of her general work capacities, work stamina, and consistency of work performance."* (Emphasis added.) Dr. Mekjian also indicated that he would defer to Plaintiff's treating physician

with regard to the effects of the fatigue with regard to any disability.

46. On or about June 15, 2009, HARTFORD forwarded Dr. Mekjian's report to Dr. Green for comment.

47. On or about August 19, 2009, an Employability Analysis Report prepared by HARTFORD was issued. The analyst found that, "[t]he search examined a number of occupations. The match list produced own occupation of Consultant as the only gainful occupation."

48. On or about September 8, 2009, HARTFORD sent Plaintiff a letter stating that they were terminating her benefits based upon their finding that she was no longer disabled from "any occupation." The letter indicated that the decision was based upon the physical independent examination by Dr. Michael Cohen who determined that she was not "limited due to any physical disability from performing a full-time sedentary type work." The letter also stated the decision was based upon the report by Dr. Michael Mekjian which HARTFORD claimed did not support a finding of disability.

49. On November 10, 2009, Dr. Green wrote to HARTFORD regarding Dr. Mekjian's report, opining that Dr. Mekjian's report did, in fact, articulate and confirm factors suggesting disability and cited to portions of Dr. Mekjian's report which supported her own opinion that Plaintiff remained unable to engage in full time employment.

50. HARTFORD did not respond to the letter from Dr. Green, but rather directed Plaintiff to the appeal process.

51. On or about December 8, 2009, a letter of appeal with supporting documentation was sent to HARTFORD by Plaintiff's authorized representative.

52. Receipt of the appeal was acknowledged by HARTFORD on or about December 14, 2009.

SPINELLI, DONALD
& NOTT

53. On or about January 19, 2010, at HARTFORD's request, the records and reports concerning Plaintiff were forwarded to University Disability Consortium (UDC) for review and comment on Plaintiff's medical records and the neuropsychological report by Dr. Mekjian. UDC assigned the tasks to Drs. McQuillen and Dr. Jay. Daniel P. McQuillen, M.D.. Dr. McQuillen opined, without examining Plaintiff or speaking with any of her treating physicians, that the "self-reported level of fatigue is not substantiated by the objective medical records…". Dr. McQuillen opined there was no physical reason why she could not work.

54. Dr. Jay opined that Dr. Mekjian's report did not support cognitive or psychiatric disability. Neither Dr. McQuillen nor Dr. Jay examined or even met Plaintiff, nor did either one of them speak with Plaintiff's treating physicians prior to rendering their opinions that she was not disabled.

55. Plaintiff is informed and believes that the University Disability Consortium (UDC) has been openly criticized for a lack of objectivity in a judicial ruling on a LTD claim for benefits. Plaintiff is further informed and believes that the UDC has been hired by HARTFORD repeatedly to perform evaluations of claimants, and that the reports generated by UDC have been inordinately in favor of HARTFORD.

56. The same day Dr. McQuillen issued his report, March 8, 2010, HARTFORD wrote to Plaintiff indicating that, based upon Dr. McQuillen and Dr. Jay's reports, her appeal was being denied.

57. Plaintiff was not informed during the pendency of her appeal of any difficulty experienced by Dr. McQuillen or HARTFORD in reaching Dr. Green.

58. On or about March 15, 2010, Dr. Green spoke with Dr. McQuillen.

59. On or about March 16, 2010, Dr. Green contacted the office of Dr. McQuillen in order to obtain a fax number. According to claim records, Dr. McQuillen notified HARTFORD of

SPINELLI, DONALD & NOTT

Dr. Green's efforts to obtain a fax number and told HARTFORD that he suspected Dr. Green was attempting to "flood him with more records." HARTFORD Appeal Specialist Jeff Jones instructed that Dr. Green's office be notified that no additional materials would be reviewed and the appeal was closed.

60. On or about March 16, 2010, HARTFORD received an Addendum from Dr. McQuillen indicating that he had spoken to Dr. Green and that his opinions "remained unchanged."

61. On or about March 16, 2010, HARTFORD wrote to Plaintiff's representative advising her of the Addendum prepared by Dr. McQuillen and reviewed by HARTFORD. The letter concluded by stating, "Therefore our final determination to uphold the termination of benefits remains unchanged."

62. In spite of requests that they do so, no consideration of further comments or documentation by Dr. Green following her discussion with Dr. McQuillen on March 15, 2010 was entertained by HARTFORD.

63. Plaintiff remains qualified under the policy to receive benefits.

64. Plaintiff has exhausted all administrative remedies available.

## FIRST CAUSE OF ACTION

## ERISA- ENFORCEMENT ACTION [29 U.S.C. §1132(a)(1)(B)]

### Against All Defendants

65. Plaintiff realleges and incorporates paragraphs 1-64 by reference as if they were set forth herein in full.

66. Pursuant to 29 U.S.C. §1132(a), Plaintiff alleges that she is entitled to relief for past benefits wrongfully denied her under her long-term disability policy obtained from Defendant PWC through her employment.

67. Said long-term disability policy is an "employee welfare benefit plan" as defined by

29 U.S.C. §1002.

68. Plaintiff is a participant in said long-term disability plan as defined by 29 U.S.C. §1002.

69. PWC is the employer who sponsored the plan and from whom Plaintiff purchased said policy. PWC is also the "policy holder." PWC has the authority to appoint a Plan Administrator pursuant to the Plan Document.

70. The Plan is fully insured and administered, at least in part, by Defendants HARTFORD collectively. HARTFORD also had the "responsibility of fiduciary for the provision of full and fair review of denials pursuant to Section 503 of ERISA," according to the Schedule of Insurance.

71. Said benefits were wrongfully denied on or after March 16, 2010.

72. The plan document defines "disability or disabled" as follows:

"Disability or disabled means that during the Elimination Period and for the next 60 months, You are prevented by :

    1. accidental bodily injury;

    2. sickness;

    3. Mental Illness;

    4. Substance Abuse; or

    5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result Your Current Monthly Earnings are no more than 80% of Your Indexed Pre-Disability Earnings.

After that, You must be so prevented from performing one or more of the Essential Duties of Any Occupation."

73. As set for the Plan Document, "Essential Duty" means a duty that:

   1. is substantial, not incidental;

   2. is fundamental or inherent to the occupation; and

   3. cannot be reasonably omitted or changed.

   To be at work for the number of hours in Your regularly scheduled workweek is also an Essential Duty."

74. Plaintiff qualified for said disability status at the time of her claim to HARTFORD collectively for long-term disability benefits and remains qualified to the present. Said qualification is supported by the medical evidence in the possession of HARTFORD or otherwise available to them.

75. As a result of said failure to be paid benefits to which she is entitled, Plaintiff is entitled to recover said lost benefits, costs, attorneys' fees as provided by law, and any other relief deemed appropriate by the Court.

WHEREFORE, Plaintiff prays for relief as follows:

1. Damages for failure to provide long-term disability benefits owed and owing to Plaintiff under the Plan, plus interest, including prejudgment interest, in a sum to be determined.

2. For costs of suit incurred herein;

3. For attorneys' fees incurred as permitted under the law;

4. For such other relief as the court may deem proper.

DATED: February 11, 2011

**SPINELLI, DONALD & NOTT**

/s/ Amanda Uhrhammer
AMANDA UHRHAMMER
Attorneys for Plaintiff
MARY BETH FAULKNER

SPINELLI, DONALD & NOTT