UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARY BETH FAULKNER,

        Plaintiff,

    v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, et al.,

        Defendants.

_____/

NO. CIV. S-11-0408 LKK/CKD

O R D E R

    This is a case brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Plaintiff Mary Beth Faulkner challenges the termination of her long-term disability benefits by defendant Hartford Life & Accident Ins. Co. ("Hartford"). For the reasons set forth below, plaintiff's motion for summary judgment is **GRANTED**, and defendant's cross-motion for summary judgment is **DENIED**.

**SUMMARY**

    Plaintiff Mary Beth Faulkner was bitten by a tick while camping with her family in Maryland. Soon after, she began complaining of debilitating fatigue and other symptoms. She was

1

1  examined and treated by several physicians and diagnosed with Lyme

2  Disease (among other diagnoses).  These physicians did not agree

3  on the etiology of her complaints,[1] but they all agreed that

4  Faulkner was suffering fatigue and other debilitating symptoms,

5  that the symptoms were real, and that they prevented her from

6  working on a full-time basis.  On December 20, 2003, the Social

7  Security Administration determined that Faulkner was disabled

8  (effective October 20, 2001), and awarded her benefits.[2]   It

9  reached the same conclusion again on October 19, 2005.[3]  Hartford

10  itself concluded that plaintiff, who was covered by Hartford's

11  disability policy, was disabled by these symptoms, and awarded her

12  short-term disability benefits and then long-term disability

13  benefits.  It conducted periodic reviews of plaintiff's medical

14  records, and concluded each time that she was indeed disabled and

15  unable to work.

16  _____

17      [1] The various etiologies were Lyme disease, encephalopathy,
    chronic fatigue syndrome, Bartellenosis (Bartonella), Babeosis,
18  fibromyalgia, and neuroborreliosis.

19      [2] Dkt. No. 36 (Defendant's Response to Plaintiff's Statement
    of Undisputed Facts) ¶ 20; AR 788 (Dkt. No. 19-8).  On May 9 and
20  June 19, 2002, Hartford wrote to plaintiff asking (or requiring)
    her to apply for Social Security Disability benefits ("SSDI")
21  through the appeal process, as it appeared that her disability
    would last over 12 months.  Dkt. No. 36 ¶ 11 (May 9, 2002); AR 864
22  (Dkt. NO. 19-9) (June 19, 2002).  Plaintiff's claim was initially
    denied in October 2002.  Dkt. No. 36 ¶ 11; AR 839 (Dkt. No. 19-9).
23  Plaintiff appealed the denial on November 30, 2002.  Dkt. No. 36
    ¶ 20; AR 821 (Dkt. No. 19-9).
24
        [3] Dkt. No. 36 ¶ 25; AR 618 (Dkt. NO. 19-7).  This was
25  apparently the decision on appeal.  The Social Security
    Administration had previously informed plaintiff that her benefits
26  would cease in May 2005.  Dkt. No. 36 ¶ 23; AR 729 (Dkt. No. 19-8).

1    However, in 2008, Hartford thought that it had detected a

2 discrepancy in her treating physician's statements, and initiated

3 a fraud investigation of plaintiff's claim.  After conducting a

4 surreptitious surveillance of plaintiff, and finding no fraud,

5 Hartford hired a series of reviewers who concluded that Faulkner

6 was not disabled (one of them concluded, contrary to Hartford's own

7 conclusions, that she had never been sick), and that she could

8 work.  Based on the views of these hired reviewers, Hartford

9 terminated Faulkner's disability benefits.  Faulkner sues here

10 seeking reinstatement of the benefits.

11 **I.   BACKGROUND**

12    Starting March 15, 1999, plaintiff worked as a tax consultant

13 for PricewaterhouseCoopers LLP ("PwC").[4]  In July 1999, plaintiff

14 became covered by defendant PricewaterhouseCoopers LLP Health &

15 Welfare Benefits Plan (the "Plan").[5]  The Plan is an employee

16 benefit plan sponsored by plaintiff's employer PwC.[6]  The Plan was

17 administered and insured by defendant Hartford Life & Accident Ins.

18 Co.[7]  The Plan confers on Hartford "full discretion and authority

19

20    [4] Dkt. No. 36 (Defendant's Response to Plaintiff's Statement
of Undisputed Facts) ¶ 2.
21

22    [5] Administrative Record ("AR") 883 (Dkt. No. 19-9).

23    [6] Dkt. No. 32 (Plaintiff's Response to Defendant's Statement
of Undisputed Facts) ¶ 1.

24    [7] Dkt. No. 36 ¶ 86.  PwC is the Plan Administrator.  However,
25 "For purposes of claims administration, the Plan Administrator has
assigned the fiduciary responsibility for claim determinations to
Hartford Life & Accident Ins. Co., the Claims Administrator for
26 this program."  Policy ("POL") 037 (Dkt. No. 21-1).

1   to determine eligibility for benefits."[8]   Accordingly, in its

2   fiduciary capacity as administrator ("claims review fiduciary"),

3   Hartford determines whether a claim should be paid under the

4   policy,[9] and then either pays the claim or not, in accordance with

5   its determination.[10]

6       A.   **Tick Bite and Initial Treatment; Plaintiff Is Treated by**

7            **Dr. Mo.[11]**

8       On May 19, 2001, while hiking with her family in Maryland,

9   plaintiff was bitten by a tick.[12]  She soon developed a bull's-eye

10  expanding rash and came down with flu-like symptoms, including

11  fatigue, fever, headaches, myalgia, weakness, facial pain and

12  palsy, and dizziness.[13]  On June 14, 2001, plaintiff visited Steven

13  Mo, M.D., who was apparently her primary care doctor at that

14  time.[14]   Dr. Mo diagnosed plaintiff with "Lyme disease."[15]

15  Plaintiff continued to be treated by Dr. Mo (June 2001 to December

16  _____

17      [8] Dkt. No. 32 ¶ 7.

18      [9] "The people who operate your Plan, called 'fiduciaries' of
    the Plan, have a duty to do so prudently and in the interest of you
19  and other Plan participants and beneficiaries."  POL 039.   The
    claims procedure is governed by federal regulations promulgated at
20  29 C.F.R. § 2560.503-1.

21      [10] POL 018 (Dkt. No. 21-1).

22      [11] Steven Mo, M.D.

23      [12] Dkt. No. 36 ¶ 3.

24      [13] Dkt. No. 36 ¶ 4.

25      [14] Id. ¶ 5.

26      [15] Dkt. No. 36 ¶ 5.

4

2001), who reported on plaintiff's fatigue, lethargy, neurologic deficits, tremulous hands, inability to stand, walk or sit, and incapacitating symptoms.[16]  Some of these findings were listed as examination findings and others were listed as subjective complaints.  Dr. Mo never expressed any doubts about plaintiff's subjective complaints, and set the tone for the remainder of plaintiff's experiences when he noted that she was "unable to perform meaningful tasks for long."[17]

On July 5, 2001, plaintiff was admitted to the hospital, where she was treated by Daniel P. Ikeda, M.D.,[18] and received IV antibiotic treatment.[19]  In July 2001, plaintiff applied for short-term disability benefits under the Hartford policy.[20]  Plaintiff's last day of work at PwC was July 15, 2001.[21]  On August 20, 2001,

---

[16] AR 973-74 (Dkt. No. 19-10) (10-26-2001: Lyme disease, fatigue, myalgias, patient "is unable to perform any meaningful tasks for long"); 971 (10-10-2001: fatigue); 945-46 (8-7-2001 [signed]: Lyme disease; re activities – "some days [patient] cannot do any of these activities for more than a few minutes"); 940-41 (9-5-2001: Lyme disease, significant fatigue complaints, at 50% capacity); AR 907 (10-1-2001: fatigue).

AR 897-98 (Dkt. No. 19-9) (11-30-2001 [signed] (Lyme disease, significant fatigue complaints, at 50% capacity); 870-71 (12-19-2001 [signed]: Lyme disease, relapsing symptoms, sometimes incapacitating).

[17] AR 973 (Dkt. No. 19-10).

[18] Daniel P. Ikeda, M.D. of the Pulmonary Medicine, Infectious Disease and Critical Care Consultants Medical Group (Sacramento, Carmichael and Roseville, CA).

[19] Dkt. No. 36 ¶ 6.

[20] Dkt. No. 36 ¶ 9; AR 964 (Dkt. No. 19-10).

[21] Dkt. No. 36 ¶ 2.

1  Hartford approved the payment of short-term disability benefits to

2  plaintiff, and subsequently extended payments through January 2,

3  2002, the maximum period for short-term disability benefits.[22]

4         **B.   Plaintiff Is Treated by Dr. Ikeda.**[23]

5         On January 11, 2002, Hartford approved the payment of long-

6  term disability benefits to plaintiff, after finding that she was

7  unable to work in her own occupation.[24]  Soon afterward, it appears

8  that plaintiff began to be treated principally by Daniel P. Ikeda,

9  M.D. (July 2001 to September 2004).  Dr. Ikeda was clearly dubious

10 about plaintiff's Lyme disease diagnosis.[25]  Over the course of

11 many examinations, he too noted her fatigue, although he indicated

12 that it might be caused by fibromyalgia or chronic fatigue

13

14

15   [22] Dkt. No. 36 ¶ 10.  See also, AR 968 (Dkt. No. 19-10)
     (extension through September 23, 2001); AR 966 (Dkt. No. 19-10)
16   (extension through September 16, 2001); AR 935 (Dkt. No. 19-10)
     (extension through September 30, 2001); AR 900 (Dkt. No. 19-9)
17   (extension through November 30, 2001).  See AR 880 (Dkt. No. 19-9)
     (referring to extension through December 31, 2001).
18

19   [23] Daniel P. Ikeda, M.D. of the Pulmonary Medicine, Infectious
     Disease and Critical Care Consultants Medical Group (Sacramento,
20   Carmichael and Roseville, CA).

21   [24] Dkt. No. 36 ¶ 13; AR 854 (Dkt. No. 19-9).  Under the
     Hartford policy, plaintiff was disabled if, during the first five
22   years of benefits, she was unable to work in her own occupation.
     POL 008 (Dtk. No. 21-1).  After that period, plaintiff was disabled
23   if she could not work in any occupation.  Id.  See also, AR 883
     (Dkt. No. 19-9) (12-19-2001: Application for Long-Term Disability
24   Income Benefits, Employer's Statement); AR 872 (Dkt. No. 19-9)
     (same, Employee's Statement).
25
     [25] AR 696 (Dkt. No. 19-7) (3-22-2002: "I am not certain that
26   she has Lyme disease whatsoever"); 692 (5-30-2002: "my impressions
     are that she probably no longer has active Lyme disease").

1  syndrome.[26]    Indeed,  he  never  expressed  any  doubts  about

2  plaintiff's subjective complaints.  He was so doubtful of the Lyme

3  disease diagnosis, however, that he scheduled plaintiff for a lab

4  test, predicting confidently that it would be negative.  The test

5  came back positive, leading Dr. Ikeda to a new conclusion: "it

6  suggests  that  Mary  Beth  continues  to  have  persistent  Lyme

7  disease."[27]

8      **C.   Plaintiff Is Examined by Dr. Liegner.[28]**

9      On September 10, 2002, plaintiff was evaluated by Kenneth B.

10  Liegner, M.D., of New York.[29]  Dr. Liegner reported that despite

11  the absence of laboratory substantiation, he had no doubt that

12  plaintiff had Lyme disease.[30]

13  ────────────────────

14  [26] See AR 950-51 (Dkt. No. 19-10) (7-12-2001: Lyme Disease;
    becomes tired easily); AR 700 (7-12-2001: suspected Lyme disease),
15  698 (3-22-2002 [no exam]: fatigue symptoms); 691-92 (5-30-2002 [no
    exam]: "Fibromyalgia/chronic fatigue syndrome"); 687 (10-7-2002:
16  persistent Lyme disease); 681 (4-29-2003: fatigue syndrome with
    improvement); 677 (11-19-2003: improved fatigue syndrome), 673
17  (6-8-2004: "? fatigue syndrome"), 671 (9-20-2004: suspected Lyme
    disease).

18  [27] AR 688 (Dkt. No. 19-7) (October 7, 2002); 685 (11-7-2002:
    Lyme disease with positive Lyme dot blot test); 679 (8-15-2003:
19  chronic Lyme disease, generally improved).  Later, Dr. Ikeda came
    to the conclusion that after treatment, Lyme disease might no
20  longer be present.  673 (6-4-2004: "I am not convinced that this
    represents Lyme disease").
21
22  [28] Kenneth B. Liegner, M.D. of Internal & Critical Care
    Medicine (Armonk, NY).  Although Dr. Liegner examined plaintiff,
23  he does not reappear in the Administrative Record, so it does not
    seem that this New York doctor ever became a treating physician for
24  plaintiff.

25  [29] Dkt. No. 36 ¶ 16.

26  [30] "There is absolutely no laboratory substantiation of the
    diagnosis however the clinical presentation seems so clear that I

7

1    **D.    Plaintiff is Treated by Dr. Green.**[31]

2    Plaintiff was then examined and treated by Christine Green,

3    M.D. (April 2002 to the present).[32]   On April 27, 2002, Dr. Green

4    wrote a letter to Hartford setting forth her view that plaintiff

5    was disabled from Lyme disease, and proposing to treat her for

6    neuroborreliosis.[33]    Like the doctors before her, Dr. Green

7    consistently reports on plaintiff's fatigue and "cognitive trouble

8    memory issues."[34]   She diagnosed plaintiff with Lyme disease and

9    encephalopathy, and concluded that plaintiff was "physically unable

10   to stand, sit or walk consistently," and that she "has had real

11   ////

12   ////

13   _____

14   would say a diagnosis of Lyme disease is definite."  AR 835 (Dkt. No. 19-9).

15   [31] Christine Green, M.D. of Green Oaks Medical Center, PC (Los

16   Altos, CA).

17   [32] Dr. Ikeda continued to treat plaintiff, also, at least until September 2004.

18   [33] AR 858 (Dkt. NO. 19-9).

19   [34] On September 8, 2003, Hartford wrote to Dr. Christine

20   Green, plaintiff's treating physician, and requested the doctor's notes and lab tests for September 1, 2002 through the present.  On September 30, 2003, Dr. Green sent Hartford the requested records.

21   According to those records, on February 19, 2003, Dr. Green reported, among other things, that plaintiff did not have the

22   stamina to work, could not get up to shower, and could not drive to work.  AR 804 (Dkt. No. 19-9).  On March 26, 2003, Dr. Green

23   reported, among other things, that the patient was "Overall better but unable to reliably work."  AR 802 (Dkt. No. 19-9).  On April

24   30, 2003, Dr. Green reported progress, and that the patient was "overall better," but also that she was "unable to reliably work."

25   AR 800 (Dkt. No. 19-8).  On June 23, 2003, plaintiff reported that she was "doing better," but also that "she still gets tired and

26   will get off balance when she does."  AR 798 (Dkt. No. 19-8).

1  cognitive difficulty."[35]  Dr. Green's notes consistently state that

2  plaintiff has "shift work disorder ie cannot be alert for work."[36]

3      Dr. Green reported that plaintiff improved somewhat under her

4  care, but remained disabled.[37]  Dr. Green subsequently released

5  plaintiff to work no more than 12 hours per week,[38] and eventually

6  increased that to 18 hours per week.[39]

7      **E.   Hartford Confirms that Plaintiff Is Totally Disabled.**

8      On August 31, 2006, Hartford advised plaintiff that going

9  forward (effective January 3, 2007), she would be required to show

10  that she was disabled such that she could not work in any

11  occupation for which she was qualified.[40]  On January 11, 2007,

12  Hartford advised plaintiff that it had "conducted a thorough review

13  of all the medical and vocational information" in her claim file.[41]

14  _____

15  [35] AR 610 (Dkt. No. 19-7) (December 3, 2005). See also AR 759
16  (Dkt. No. 19-8) (March 2, 2004) (same; patient can only work every
    other day).

17  [36] E.g., AR 421 (Dkt. No. 19-5).

18  [37] See AR 610 (Dkt. No. 19-7) (significant improvement with
    antibiotic, but still "physically unable to stand, sit or walk
19  consistently," and "she has real cognitive difficulty").

20  [38] Dkt. No. 36 ¶ 28; AR 590 (Dkt. No. 19-6) (January 9, 2006).
    Plaintiff thereupon took a part-time job for another accounting
21  firm until it ran out of work for her. Dkt. No. 36 ¶ 29. During
    this employment, she always kept Hartford fully informed of her
22  work status. Id.; see also, AR 572 (Dkt. No. 19-6) (May 1, 2006).

23  [39] Dkt. No. 36 ¶ 29; AR 561 (Dkt. No. 16-6) (May 8, 2006).

24  [40] Dkt. No. 36 ¶ 32; AR 047 (Dkt. No. 19-1). Previously,
    during in the first five years of benefits, plaintiff had to show
25  only that she was unable to work in her own occupation.

26  [41] AR 042 (Dkt. No. 19-1).

1  Based upon that review, Hartford determined that plaintiff met "the

2  policy definition of Disability," and that she would continue to

3  receive long-term disability benefits.[42]  In essence, Hartford told

4  plaintiff that as of January 2007, it had determined that she was

5  disabled even under its strictest standard, that is, her health

6  prevented her from "performing one or more of the Essential Duties

7  of Any Occupation."[43]

8      On June 8, 2007, Hartford began its first interim review of

9  plaintiff's disability status since the change of her status in

10 January 2007.[44]   It attempted to obtain information from

11 plaintiff's treating physician, but had trouble getting a proper

12 response from the doctor.[45]   Hartford then rejected Dr. Green's

13 July 2007 Attending Physician Statement because it was "minimal,"

14 and accordingly, Hartford wrote directly to Dr. Green asking for

15 copies of plaintiff's medical records.[46]  The Administrative Record

16 appears to be silent about the outcome of this back-and-forth,

17 however, it appears that benefits continued.  The court therefore

18 infers that Hartford concluded that plaintiff continued to be

19 totally disabled through September 4, 2008, when it requested

20 another update.

21 _____

22     [42] AR 042 (Dkt. No. 19-1).

23     [43] See AR 047 (Dkt. No. 19-1) (August 31, 2006 letter setting
out the definition of Disability under the policy).

24     [44] AR 041 (Dkt. No. 19-1).

25     [45] AR 039 (Dkt. No. 19-1).

26     [46] AR 040 (Dkt. No. 19-1).

On September 4, 2008, Kay McCormick, the Hartford claims specialist, again set about to get "updated information about your disability for our claim records."[47]   The specialist gathered information about plaintiff's earnings at the time of her disability, and the amounts Hartford had paid out in benefits to plaintiff.   She also requested information from Dr. Green.[48]

Dr. Green submitted office notes from September 22, 2008[49] and October 4, 2008,[50] and an Attending Physician Statement also dated October 4, 2008.[51]   Hartford's current litigation position is that there was an "inconsistency between Dr. Green's restrictions and limitations on September 22, 2008 and October 4, 2008."[52]

The September 22, 2008 office notes indicate, among other things, that Dr. Green believes plaintiff could work 2 hours per day, 3-4 days per week.   It reports that she has "Shift work disorder ie cannot be alert for her work," and that she is "still disabled."[53]   The October 4, 2008 office notes indicate, among other things, that plaintiff has "Severe fatigue," that she has

---

[47] AR 033 (Dkt. No. 19-1).

[48]   It appears that Hartford had some trouble getting a response from Dr. Green.   AR 025-26 (Dkt. No. 19-1).   In addition, McCormick sought information from Dr. Michael Burman.

[49] AR 421, Dkt. No. 19-5.

[50] AR 420, Dkt. No. 19-5.

[51] AR 452, Dkt. No. 19-5.

[52] Defendants' Motion for SJ at 10 (Dkt. No. 20-1 at 16).

[53] AR 421 (Dkt. No. 19-5).

11

1   "Shift work disorder ie cannot be alert for her work," and that she

2   is "still disabled."[54]   The October 4, 2008 APS indicates, among

3   other things, the plaintiff can sit for 6 hours, stand for 30

4   minutes and walk for 1 hour, with an intermittent need to recline

5   or lie down.[55]   However, Hartford's fill-in statement form for

6   Attending Physicians (the "APS"), does not ask, nor provide a fill-

7   in location to indicate, how many days per week these activities

8   could be sustained.

9        Hartford does not explain what the inconsistency was.   The

10  only possibility for confusion the court can identify is that Dr.

11  Green's statement on September 22nd states that plaintiff could

12  work 2 hours per day, 3-4 days per week, while her October 4th

13  statement is that plaintiff could sit six hours per day, in

14  addition to standing and walking an additional 1.5 hours.

15       In fact, Dr. Green would later clarify, as she had previously

16  clarified for Hartford,[56] although plaintiff could sit for six

17  hours per day, she could only keep this up for 3 days per week, and

18  that in any event, she could not sit for 6 hours in an office

19  environment.[57]   And even before 2007, Dr. Green had previously

20

21       [54] AR 420 (Dkt. No. 19-5).

22       [55] AR 452 (Dkt. No 19-5).

23       [56] The medical forms sent to Dr. Green do not ask her to opine
        on how many days or hours in a week plaintiff could work.   However,
24      when Hartford specifically asked about this, in January 2007, Dr.
        Green advised Hartford that plaintiff could work no more than 18
25      hours in a week.   AR 503 (Dkt. No. 19-6).

26       [57] AR 380 (Dkt. No. 19-4) (February 21, 2009).

1    indicated that plaintiff could sit for 2 hours at a time, for up
2    to six hours in a day.[58]   Hartford, had it reviewed Dr. Green's
3    notes, would have seen that Dr. Green's notation of "2 hours"
4    referred to the amount of work or sitting plaintiff could do <u>at a</u>
5    <u>time</u>, and that plaintiff could do that 3 times in a day, for a
6    total of 6 hours.   Thus, it does not appear that there was any
7    inconsistency, since in each case, Dr. Green was saying that
8    plaintiff could work (sitting) for 2 hours at a time, three times
9    per day (6 hours total per day), for three days in the week (18
10   hours total per week).

11       **F.   Hartford Investigates Plaintiff for Fraud**

12       Hartford never sought clarification from Dr. Green for what
13   it now claims was an inconsistency in her reports.   Instead, the
14   Hartford claims specialist handling plaintiff's claim referred the
15   matter to Hartford's Special Investigations Unit for a fraud
16   investigation, stating that plaintiff "may have more functionality
17   than what her AP [Attending Physician] has outlined."[59]   The
18   investigation included surreptitious surveillance of plaintiff.[60]

19       It appears that the investigation and surreptitious
20   surveillance ended with no finding of fraud.   To the contrary, the
21   investigators found that plaintiff had "some functionality, but not
22   consistent functionality" regarding her ability to lift (referring

23   _____

24       [58] AR 512 (Dkt. No. 19-6).

25       [59] AR 417 (Dkt. No. 19-5).

26       [60] Dkt. No. 36 ¶ 39.

1    to lifting her baby into the car), bend at the waist (so that she

2    can put the baby in a car seat) and open and close car doors.[61]

3    　　　**G.　Hartford Hires Dr. Cohen[62] for an Independent Medical**

4    　　　　　**Examination.**

5    　　　On February 17, 2009, Hartford hired Michael Cohen, M.D., to

6    provide an "independent" medical evaluation of plaintiff's

7    condition.[63]  Dr. Cohen examined plaintiff on March 16, 2009, and

8    reviewed the medical records in her file.  Dr. Cohen found that

9    plaintiff suffered from "chronic fatigue syndrome, possibly related

10   to tick bite/Lymed disease/Babesiosis disease."[64]  Nevertheless, he

11   found that plaintiff "does not have any cognitive deficit," could

12   sit an unlimited number of hours in a day, stand, walk and lift 10

13   pounds during the day, bend at the waist, drive frequently,

14   interact with colleagues and customers, endorse checks and can

15   begin vocational rehabilitation.  He does not, however, identify

16   any part of the medical record, nor any part of his own examination

17   that supported these conclusions.

18   　　　Dr. Cohen does not address Dr. Green's contrary finding that

19   plaintiff did have cognitive deficits.  He does not address Dr.

20   Green's contrary findings that plaintiff can only drive

21   

22   　　　[61] SIU [a part of the administrative record relating to the
     Special Investigation Unit] 020 (Dkt. No. 24-4).

23   

24   　　　[62] Michael Cohen, M.D. of Sutter Medical Group (Roseville,
     CA).

25   　　　[63] Dkt. No. 36 ¶ 40; AR 023-24 (Dkt. No. 19-1).

26   　　　[64] AR 369 (Dkt. No. 19-4) (March 16, 2009).

1  infrequently and for short distances.  He does not address Dr.

2  Green's contrary finding that plaintiff is not ready for vocational

3  rehabilitation.  He does not address Dr. Green's finding that

4  plaintiff could only work 18 hours per week.  He does not address

5  Dr. Green's finding that plaintiff was totally disabled.[65]

6      In any event, Dr. Cohen does not opine on how many days a week

7  plaintiff could keep up the activities he listed.  He does not

8  claim that plaintiff could work 40 hours a week, nor any more than

9  the 18 hours per week established by Dr. Green.  Dr. Cohen

10 concluded that there was "no OBJECTIVE medical evidence to support

11 total disability."[66]  However, he did not opine that plaintiff was

12 not totally disabled, and does not reject Dr. Green's finding that

13 plaintiff was totally disabled.  He does not explain what

14 significance to give the absence of objective evidence versus all

15 the examination findings and subjective complaints reported by all

16 the doctors who had examined and/or treated plaintiff before him.

17     On April 1, 2009, Hartford again wrote to Dr. Green, this time

18 asking her to comment on Dr. Cohen's evaluation.  On April 19,

19 2009, Dr. Green strenuously objected to Dr. Cohen's report, and

20 ////

21 ////

22 ////

---

23

24     [65] Although Dr. Green found that plaintiff could work 18 hours, plaintiff was still totally disabled under the policy, because she could not work 40 hours per week in any job for which she was qualified.

25

26     [66] AR 370 (Dkt. No. 19-4) (emphasis in text).

15

1   criticized Dr. Cohen's 1-hour examination[67] and record review.[68]

2   She reiterated her view that plaintiff could not work more than

3   half time, and noted that even assuming plaintiff could sit for 8

4   hours at a time, that did not mean she could sit <u>and</u> carry out

5   cognitive functions during that time.

6       **H.   Hartford Hires Dr. Mekjian[69] for a Neurophsychological**

7            **Examination.**

8       Hartford then hired Michael Z. Mekjian, Ph.D., to conduct a

9   neuropsychological examination of plaintiff.  Dr. Mekjian conducted

10  a Neurophsychological exam on June 23, 2009.  Although Hartford

11  asserts that it requested this examination in response to Dr.

12  Green's suggestion,[70] the record does not show why Hartford did not

13  follow through on Dr. Green's other suggestions.[71]  Dr. Mekjian

14  concluded that:

15      Ms. Faulkner is not functioning up to her fullest

16

17      [67] Dr. Green does not state how she knows the examination
        lasted only one hour.

18

19      [68] AR 359-61 (Dkt. No. 19-4).

20      [69] Michael Z. Mekjian, Ph.D. of Neuropsychology,
        Psychodiagnostics & Forensics (Los Angeles, CA).

21      [70] Dkt. No. 36 ¶ 48; AR 349 (Dkt. No. 19-4) (May 26, 2009).

22      [71] Dr. Green suggested "[1] neuropsychiatric testing,
        [2] Neurospect, [3] MRI, [4] measurement of neurological system
23      such as EMG or sural nerve biopsies, and [5] other tests designed
        to rule out autoimmune or sequellae of Lyme disease." AR 360 (Dkt.
24      No. 19-4).  Hartford followed through only on the subjective
        neuropsychiatric testing, but not on any of the other, apparently
25      objective tests Dr. Green suggested.  Dr. Green also suggested
        [6] an ophthamalogical exam and [7] a mental status exam (AR 359),
26      neither of which Hartford followed up on.

16

neurocognitive potential at the present time, and does show intermittent lapses in cognitive processing capacities which appear to primarily be secondary to fatigue affects which have an adverse impact on the patient's capacity to access her innate neurocognitive processing abilities. As previously noted, Ms. Faulkner does not exhibit any significant organic based neuropsychological deficits, but her neurocognitive functioning is adversely affected by her chronic fatigue.[72]

He also concluded that plaintiff's "fatigue levels clearly have a negative impact on her overall neurocognitive processing capacities [and her overall well-being] which would most likely carry over into the workplace in terms of her general work capacities, work stamina and consistency of work performance."

Nevertheless, his final conclusion was that plaintiff's condition was not "sufficiently severe enough to render her Temporarily Totally Disabled[73] on either a neuropsychiatric or psychiatric basis[74] at the present time."[75]  There is no substantive

---

[72] AR 346 (Dkt. No. 19-4).

[73] There is no explanation in the record of what is meant by "Temporarily Totally Disabled," or whether it has anything to do with the definition of disability used in the Policy.

[74] Dr. Mekjian is not a psychiatrist.  There is no explanation in the record of how a non-psychiatrist can reach a reliable conclusion on a psychiatric matter.

[75] Unsurprisingly, both sides claim that this report supports its case.

17

discussion of how plaintiff's neurocognitive impairments might play out in a 40-hour work week.

### I.   The Claims Specialist Who Suspected Fraud Evaluates Plaintiff's Employability.

Hartford next obtained an Employability Analysis Report performed and prepared by Kay McCormick, the person who had just referred plaintiff for a fraud investigation.[76]  Ms. McCormick concluded that plaintiff was qualified for her own occupation (but no other).[77]  However, her report did not address whether plaintiff could do that occupation full time.[78]

### J.   Hartford Terminates Benefits and Plaintiff Appeals.

On September 8, 2009, Hartford terminated plaintiff's long-term disability benefits.[79]  On December 8, 2009, plaintiff administratively appealed.[80]  As part of the appeal process, Hartford, on January 19, 2010, hired University Disability Consortium ("UDC") to conduct a medical review.[81]  Hartford asked

---

[76] AR 286 (Dkt. No. 19-3) (August 18, 2009).

[77] AR 287 (Dkt. No. 19-3) (August 18, 2009).

[78] Indeed, none of the forms Hartford uses that appear in the Administrative Record permit the recording of how many hours per week a person can sustain the work or activities asked about.  They only ask how many hours per day a person can work.  In the case of Dr. Green, this led Hartford in January 2007 to conclude, erroneously, that plaintiff could work full-time.  Dr. Green corrected Hartford's mis-interpretation of its own form, and plaintiff's benefits continued.

[79] Dkt. No. 36 ¶ 54; AR 011 (Dkt. No. 19-1).

[80] Dkt. No. 36 ¶ 61; AR 163 (Dkt. No. 19-2).

[81] Dkt. No. 36 ¶ 62; AR 153 (Dkt. No. 19-2).

UDC to review the medical information, and based upon that review, to:

> identify the functional capacity the claimant can sustain with reasonable continuity including [1] amount of hours claimant can work per week, hours the claimant can sit, stand, walk in the workplace; [2] amount claimant can lift/carry/push/pull, drive, climb, balance, bend, stop, kneel, crouch, crawl, reach at waist level/ above shoulder level & below waist level, handle, finger & feel. [3] Please indicate any restrictions and limitations that are medically indicated for the period 9/9/09 to present.[82]

Hartford asked UDS to "Be Specific."[83]  Finally, Hartford asked UDC to [4] perform a co-morbid review, to comment on [5] the Neuropsychological Evaluation, [6] claimant's cognitive ability as it relates to her functional capacity, and [7] claimant's level of fatigue as it relates to her functional capacity.[84]  UDC assigned the reviews to Milton Jay, Ed.D., and Daniel P. McQuillen, M.D. On March 8, 2010, Hartford received reports from Dr. Jay and Dr. McQuillen.

Dr. McQuillen's report does not acknowledge that he has been asked to identify Faulkner's functional capacity with specific

---

[82] AR 154 (Dkt. No. 19-2).

[83] AR 154 (Dkt. No. 19-2).

[84] AR 154 (Dkt. No. 19-2).

reference to how many hours Faulkner can work, and the other specific and enumerated issues.  Instead, he acknowledges only the general request that he comment on "claimant's level of fatigue as it relates to her functional capacity."[85]  Consistent with his apparent failure to understand what was being asked of him, Dr. McQuillen did not answer a single one of the specific questions Hartford wanted answered.  Instead, Dr. McQuillen found – contrary to Hartford's own prior findings and the findings of every physician who had examined and treated plaintiff – that there was no evidence that plaintiff had _ever_ been ill, and that he could find nothing that indicated she was impaired or had ever been impaired.[86]

Dr. Jay also did not acknowledge the specific questions that had been asked of him – how many hours could Faulkner work, and the other enumerated issues.  He found that although plaintiff had cognitive problems traceable to her fatigue, she was not significantly impaired.[87]  Dr. Jay reported almost exclusively on Dr. Mekjian's report, and Dr. Green's interpretation of it.  He concluded that Dr. Green's interpretation of the Mekjian report was error, but that the Mekjian report was indeed flawed in several ways.  Nevertheless, he relied on that report to conclude that plaintiff was not sufficiently impaired.  Dr. Jay, also, fails to

---

[85] AR 127 & 137 (Dkt. No. 19-2).

[86] AR 137 (Dkt. No. 19-2).

[87] AR 144 (Dkt. No. 19-2).

1  indicate how many hours plaintiff could work or carry out the list

2  of activities he was asked about.  Instead, like Dr. McQuillen, Dr.

3  Jay only answers the general "comment" question, ignoring the

4  specific questions that he was engaged to answer.

5      Both reviewers submitted their reports on the same day, March

6  8, 2010.[88]  That same day, at some time before 2:16pm, Hartford

7  denied the administrative appeal.[89]  In doing so, Hartford accepted

8  the doctors' reports <u>in toto</u>, without comment or question, and

9  without any apparent concern that the doctors had neglected to

10 answer the questions they had been asked.[90]  Plaintiff timely seeks

11 judicial review of Hartford's decision.

12 **II.  STANDARDS**

13     ERISA provides that every ERISA plan shall "afford a

14 reasonable opportunity to any participant whose claim for benefits

15 has been denied for a full and fair review by the appropriate named

16 ─────────────────

17     [88] AR 127 (Dr. McQuillen)& 138 (Milton Jay, Ed.D.).  <u>See also</u>,
AR 113 (March 16, 2009: Dr. McQuillen, Addendum).

18

19     [89] AR 122-26 (Dkt. No. 19-2).  At the hearing on this matter,
counsel for Hartford argued that the appeal was not denied until

20 March 16, 2009, after Dr. McQuillen had considered a submission by
Dr. Green.  This assertion is precluded by the administrative
record, which is clear that the appeal was denied on March 8, 2010.

21 AR 124; AR 103 (October 1, 2010) ("The Hartford's final appeal
decision was made on March 8, 2010," notwithstanding Dr. Green's

22 subsequent submission, and Dr. McQuillen's "addendum").

23     [90] AR 002 (Dkt. No. 19-1).  There is nothing in the record
that states what time of day the UDC reports arrived at Hartford.

24 However, the Administrative Records shows that Hartford viewed
March 8, 2010 as an absolute deadline for issuing its determination

25 on appeal.  Accordingly, it does not appear that Hartford had any
time to take a look at the reports or to notice that they were

26 totally inadequate.

1   fiduciary of the decision denying the claim." 29 U.S.C.A. §

2   1133(2).   If the plan upholds the denial of the claim, the

3   participant may bring an action in federal district court "to

4   recover benefits due to him under the terms of his plan." 29

5   U.S.C. § 1132(a)(1)(B).

6       Once brought into court, the decision to deny benefits is

7   treated like the determination of an agency, in that it comes to

8   this court for "review." "In the ERISA context, the

9   'administrative record' consists of 'the papers the insurer had

10  when it denied the claim.'" See Montour v. Hartford Life & Acc.

11  Ins. Co., 588 F.3d 623, 632 n.4 (9th Cir. 2009), quoting Kearney

12  v. Standard Ins. Co., 175 F.3d 1084, 1086 (9th Cir.), cert. denied,

13  528 U.S. 964 (1999).[91]

14      The question for this court is whether Hartford provided

15  plaintiff with a "full and fair" review of its decision to

16

17  [91] "The record that was before the administrator furnishes the
    primary basis for review." Kearney, 175 F.3d at 1090. As the
18  Ninth Circuit has explained this rule:

19      A primary goal of ERISA was to provide a method for
        workers and beneficiaries to resolve disputes over
20      benefits inexpensively and expeditiously. Permitting or
        requiring district courts to consider evidence from both
        parties that was not presented to the plan administrator
21      would seriously impair the achievement of that goal.

22  Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1472 (9th
    Cir. 1993). It is important to recognize, however, that confining
23  the administrative record in this way contains the danger of
    confusing the business records of an insurance company with the
24  regulatory record accumulated by a governmental agency. This court
    is of course bound by the Ninth Circuit's rule, and so it will
25  review the record compiled by the claim administrator as the
    "administrative record."

26

1   terminate benefits.   29 C.F.R. § 2560.503-1(h)(1).   To qualify as

2   a "full and fair review," the administrative appeal decision by

3   Hartford must not "afford deference to the initial adverse benefit

4   decision,"   among   other   requirements.   29   C.F.R.

5   § 2560.503-1(h)(3)(ii) & (h)(4).[92]   In addition, where, as here,

6   the benefit determination was "based in whole or in part on a

7   medical judgment," Hartford was required to "consult with a health

8   care professional who has appropriate training and experience in

9   the field of medicine involved in the medical judgment." 29 C.F.R.

10  § 2560.503-1(h)(3)(iii) & (h)(4).

11      Finally, Hartford imposed an additional condition on its own

12  review.   In sending the medical files to its medical reviewer

13  (UDC), Hartford stated that "To maintain objectivity, any prior

14  medical consultant reviews are not enclosed."   AR 152 (Dkt.

15  No. 19-2).[93]

16      The standard of review applicable here depends upon the

17  language of the Plan itself:

18          a denial of benefits challenged under § 1132(a)(1)(B) is

19          to be reviewed under a <u>de novo</u> standard <u>unless the</u>

20          <u>benefit plan gives the administrator or fiduciary</u>

21          <u>discretionary authority to determine eligibility for</u>

22      _____

23      [92] Section 2560.503-1(h)(3)(ii) applies to group health plans.
        However, Section 2560.503-1(h)(4) makes that section applicable to
        disability benefit plans, as well.
24

25      [93] In spite of this, Hartford did send the medical reviews of
        Dr. Cohen and Dr. Mekjian to UDC, and the UDC reviewers relied upon
26      those reports.   Neither side discusses whether those reports are
        in fact "medical consultant reviews."

1     benefits.

2   Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)

3   (emphasis added).   Where the benefit plan does give the

4   administrator or fiduciary such discretion, the court reviews the

5   denial of benefits under the "abuse of discretion" standard.

6   Mitchell v. CB Richard Ellis Long Term Disability Plan, 611 F.3d

7   1192, 1198 (9th Cir. 2010).   In this case, the Plan confers upon

8   Hartford "full discretion and authority to determine eligibility

9   for benefits."   Standard Ins. Co. v. Morrison, 584 F.3d 837, 840

10  (9th Cir. 2009), cert. denied, 560 U.S. ___, 130 S.Ct. 3275 (May

11  17, 2010) (No. 09-885).[94]   Accordingly, the "abuse of discretion"

12  standard applies.   Id., 584 F.3d at 840.

13       However, there is a wrinkle in the standard of review because

14  Hartford is both the fiduciary administrator and also the insurer.

15  Thus, it has the fiduciary obligation to make benefit decisions

16  that are in the best interests of the insured; thus, if the

17  decision is that the claim is good, it has to pay.   This burdens

18  Hartford with a "structural conflict of interest."   Abatie v. Alta

19  Health & Life Ins. Co., 458 F.3d 955, 965 (9th Cir. 2006) (en banc)

20  ("We have held that an insurer that acts as both the plan

21  administrator and the funding source for benefits operates under

22  what may be termed a structural conflict of interest").   The "abuse

23  of discretion" standard still applies despite this conflict.

24  Abatie, 458 F.3d at 965 ("Abuse of discretion review applies to a

25  _____

26       [94] Citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,
    111 (1989).

discretion-granting plan even if the administrator has a conflict of interest"). However, the conflict must be taken into account somehow, and generally requires the court to apply a level of skepticism in conducting its "abuse of discretion" review. <u>Salomaa v. Honda Long Term Disability Plan</u>, 642 F.3d 666, 676 (9th Cir. 2011) (abuse of discretion standard applies, but "a higher degree of skepticism is appropriate where the administrator has a conflict of interest"); <u>Nolan v. Heald College</u>, 551 F.3d 1148, 1153 (9th Cir. 2009) (same).

To this end, the court is instructed to "temper the abuse of discretion standard with skepticism 'commensurate' with the conflict. <u>Id.</u> This will require going outside the administrative record "to decide the conflict's "'nature, extent, and effect on the decision-making process.'" <u>Id.</u> Moreover, the court must make its determination on the conflict <u>before</u> it considers whether the decision to terminate benefits was correct under the applicable standard. <u>Id.</u>

Next, the court must consider that the case comes before it on summary judgment. In the absence of a conflict, the summary judgment route is just the mechanism used to get the case before the court. Since the record on "appeal" is closed – it's the administrative record – the court simply decides the case based upon that record. In making the conflict determination, however, the court views that evidence "through the lens of the traditional rules of summary judgment."

////

### III.  SUMMARY OF THE ARGUMENTS

Plaintiff argues that because of Hartford's structural conflict of interest, this court should view Hartford's decision with "significant skepticism," and should consider facts outside the administrative record in determining how much skepticism to apply.  Apart from the structural conflict itself, plaintiff's argument is solely based on Hartford's use of UDC to provide doctors to review the records on appeal.[95]

Defendant argues that it has correctly managed the conflict. It submits evidence tending to show that that it takes many, many steps to ensure that its appeals decision-makers are not influenced by its profit motive.

### IV.  DISCUSSION

The policy at issue here provides that after the initial 5-year period of long-term disability benefits, a person continues to be disabled only if she is prevented by sickness (or by some other specified cause) "from performing one or more of the Essential Duties" of any occupation.  POL 008.  One of the Essential Duties of an occupation is the ability to be "at work for the number of hours in Your regularly scheduled workweek."  POL

---

[95] Plaintiff relies on Judge Wilkens's opinion in Caplan v. CNA Financial Corp., 544 F. Supp.2d 984 (N.D. Cal. 2008).  In Caplan, the district court received evidence regarding UDC's financial dependence on referrals from the insurer (Hartford Group Life Ins. Co., perhaps a different entity than involved here), evidence of the reviewing doctor's lop-sided findings of non-disability on claims submitted to him for review, his belief that "anybody can work in a sedentary occupation," and his belief that only "objective findings," are acceptable indications of disability.  544 F. Supp.2d at 989-90.

008.   It  is  undisputed  that  the  physical  requirements  of
plaintiff's job are frequent standing, walking, sitting, reaching
and keyboard use, and 40 hours of work.[96]

## A.   Conflict of Interest / Bias

The "abuse of discretion" standard applies in this case.  The
only issue here is whether the court should "temper" the standard
with "skepticism" based upon the possible effect of the conflict
on  Hartford's  decision-making.    Under  either  view,  however,
Hartford's decision to terminate plaintiff's long-term disability
benefits was an abuse of discretion.

## B.   Plaintiff's Administrative Appeal

On January 19, 2010, Hartford referred plaintiff's case on
appeal to University Disability Consortium for review.  AR 153
(Dkt. No. 19-2).   It  asked  UDC  to  answer  several  enumerated
questions, as set forth above.  On March 8, 2010, Hartford received
two reports from UDC: (1) a March 8, 2010 report authored by Daniel
McQuillen, M.D.; and (2) a March 8, 2010 report authored by Milton
Jay, Ed.D.   That same day, relying upon those reports, Hartford
wrote to plaintiff denying her administrative appeal.

## 1.   Dr. McQuillen's Report

Dr. McQuillen recapitulates at length (8 pages) the notes
of others, and the lab results.   The two parts of the report that
appear to be his response to the questions put to him are his

---

[96] AR 884 (Dkt. No. 19-9).  Hartford's termination of benefits
was based upon its finding that plaintiff could work at her own
occupation.  Accordingly, the requirements of her own job are the
ones at issue here.

1   Diagnoses and Discussion, and his final conclusions.

2       **a.   Diagnosis and Discussion**

3       Dr. McQuillen's Diagnosis and Discussion centers entirely on

4   his view that plaintiff does not have Lyme disease, Babesiosis or

5   Bartonellosis.   He states that plaintiff's diagnosis of Lyme

6   Disease was based entirely on self-reporting by the patient, and

7   that "The records reviewed do not contain any objective reports of

8   this illness [Lyme Disease] by a treating physician at the time."

9   AR 135 (Dkt. No. 19-2).   He explains away a positive test result

10  for the disease at some length by hinting that the laboratory was

11  using inappropriate tests,[97] and then indicating that if plaintiff

12  had Lyme Disease, the test results indicate that she was cured.

13  He goes on to state that "The records reviewed do not substantiate

14  a diagnosis of any _active_ infectious illness for the period

15  reviewed (6/01 - 2009)," and that "Clinical illness compatible with

16  Babesiosis, Bartonellosis, or Lyme disease is not present in the

17  records reviewed."   AR 137 (Dkt. No. 19-2).   In short, plaintiff

18  was never sick, not even during the period Hartford itself found

19

20  _____

21      [97] In support, Dr. McQuillen quotes a CDC report.   But he
    omits the following from the same report:   "Health-care providers
22  are reminded that a diagnosis of Lyme disease should be made after
    evaluation of a patient's clinical presentation and risk for
23  exposure to infected ticks, and, if indicated, after the use of
    v a l i d a t e d     l a b o r a t o r y     t e s t s . "
24  cdc.gov/mmwr/preview/mmwrhtml/mm5405a6.htm. Dr. McQuillen does not
    indicate whether the testing he criticizes is in fact the type
25  disapproved in the CDC report, and he ignores the CDC injunction
    that clinical presentation and risk for exposure to infected ticks
26  is important, as well as validated laboratory tests, "if
    indicated."   Dr. McQuillen did not examine plaintiff.

1  that she was sick.[98]

2  **b.   Final Conclusions**

3      Dr. McQuillen concludes with the only comments he makes on the

4  questions asked of him:

5      The claimant's self-reported level of fatigue is not

6      substantiated by the objective medical records and

7      appears to overstate the findings in the medical

8      records.  The APS limitations also appear to overstate

9      the objective medical findings in the medical records.

10      I find no evidence in the medical records reviewed of a

11      physical diagnosis that would impart _any_ limitation to

12      functional capacity.

13  AR 137 (Dkt. No. 19-2) (emphasis added).  In short, plaintiff is

14  not disabled, and was never disabled during the period June 2001

15  to the present.

16  **c.   Analysis of McQuillen's Report**

17      To put it mildly, there are several problems with McQuillen's

18  report:

19      (1) It entirely fails to answer the very first

20  question Hartford posed: how many hours was plaintiff able to work

21  during the week, and what functional capacity she could sustain

22  with reasonable continuity.[99]  Instead, McQuillen avoids the

23  _____

24     [98]  The fact that he never saw plaintiff and that his
conclusion contradicts every doctor who saw her, does not phase him

25  at all.

26     [99] McQuillen's dissertation on whether plaintiff had Lyme
disease, and the proper testing methodologies are interesting, but

questions by giving non-answers: the level of fatigue claimed is not supported by the record (without stating what level of fatigue, if any, is supported by the record); the limitations are overstated (but he does not say what the proper limitations are, if any); and he did not find evidence supporting a limitation to functional capacity (without saying whether plaintiff nevertheless had limitations on her functional capacity or whether Dr. Mo, Dr. Ikeda and Dr. Green were all wrong).[100]  Critically, by failing to be specific (although specificity was requested) there is no way to know if Dr. McQuillen was saying that plaintiff had no functional capacity limitations relative to a 40-hour work week, or whether he was referring to the 18-hour work week for which plaintiff had already received a medical release from Dr. Green.  It would have been extraordinary for Dr. McQuillen to be referring to a 40-hour work week, since no doctor who examined the plaintiff – including Dr. Cohen – had opined that plaintiff could complete a 40-hour work week.  Dr. McQuillen did not examine the plaintiff, only the medical records.

---

as Hartford points out in its moving papers, whether plaintiff had a specific disease or not does not answer the question of whether she was disabled.  Plaintiff could have Lyme disease and still be able to work, and conversely she could be free of Lyme disease but still be unable to work.

   [100]  If McQuillen could not find the evidence he needed to answer Hartford's questions, he could have said so, and advised Hartford that he could not give them an opinion.  Instead, he answers legalistically, as if ruling on whether plaintiff had met her burden of proof.  But Hartford did not ask Dr. McQuillen if plaintiff met her burden of proof; it asked him to identify and quantify her functional capacities and limitations.  He did not do so.

1          (2) It is false in stating or insinuating that

2 plaintiff's complaints were all her own subjective reports.  The

3 medical records contain the objective medical examinations and

4 observations of Dr. Mo., Dr. Ikeda, Dr. Liegner, Dr. Green, and

5 even the reviewers hired by Hartford, Dr. Cohen, Dr. Mekjian and

6 Dr. Jay (McQuillen's co-reviewer).    In essence, McQuillen

7 completely discards, without explanation, the views of every other

8 treating physician or other reviewer who had preceded him.  Dr.

9 McQuillen, and UDC, are not required to accord "special weight" the

10 opinions of Faulkner's treating physicians.    <u>Black & Decker</u>

11 <u>Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).  However,

12 neither may they "arbitrarily refuse to credit a claimant's

13 reliable evidence, including the opinions of a treating physician."

14 <u>Id.</u>

15          (3) It is false because there were positive lab

16 findings of disease;[101] and

17          (4) The final conclusions have no apparent

18 relationship to the Diagnosis and Discussion;

19          (5) Neither the discussion nor the findings

20 address the contrary findings of every treating or examining

21

22          [101] McQuillen says he "finds no evidence in the medical records
   reviewed of a physical diagnosis that would impart any limitation
23 to functional capacity."  But the records do contain evidence of
   such a physical diagnosis – fibromyalgia, Lyme disease, chronic
24 fatigue syndrome, Bartonellis, Babeosis – that would impart
   limitations to plaintiff's functionality.  And there are positive
25 lab results for the Babeosis and Lyme disease,  although they were
   outnumbered by the negative test results. <u>See</u> Dkt. No. 36 ¶¶ 74 &
26 76.

1   physician or reviewer who saw plaintiff before McQuillen;[102] and

2                     (6) Neither the discussion nor the findings

3   address any other possible causes of plaintiff's fatigue –

4   fibromyalgia, encephalopathy or chronic fatigue syndrome – that

5   were diagnosed by the physicians who preceded McQuillen, and which

6   were accepted by Hartford and SSA from 2001 until September 2008.

7           **2.   Milton Jay, Ed.D.'s Report.**

8       Dr. Jay reported several problems with Dr. Mekjian's report,

9   the only report he mentions or relies upon.  It is not completely

10  clear to a lay decision-maker how serious all those problems were,

11  but they appear to be important flaws.[103]  Perhaps most important,

12  Dr. Jay criticized Dr. Mekjian for conducting "no specific testing

13  of sustained attention," even though plaintiff's ability to work

14  40 hours per week was the question of the day.   Nevertheless,

15  apparently using Dr. Mekjian's faulty test results, Dr. Jay

16  concurred that plaintiff was not sufficiently impaired.

17      Worse, Dr. Jay seems to misrepresent, or at least grossly

18  oversimplify, Dr. Mekjian's report and findings.  Dr. Mekjian did

19  find that "Ms. Faulkner does not exhibit any significant organic

20  processing abilities."  However, as discussed above, Dr. Mekjian

21  found that "Ms. Faulkner is not functioning up to her fullest

22  neurocognitive potential," that she shows "intermittent lapses in

23  _____

24      [102] Dr. Quillen regurgitates their findings, but then makes no
    further mention of them, and does not analyze or comment on them
25  in any way.

26      [103] Among other things, Dr. Mekjian used long out-dated
    versions of intelligence and memory tests.

1  cognitive processing capacities ... which have an adverse impact
2  on the patient's capacity to access her innate neurocognitive
3  processing abilities," that "her neurocognitive functioning is
4  adversely affected by her chronic fatigue," that her "fatigue
5  levels clearly have a negative impact on her overall neurocognitive
6  processing capacities," and that these levels would also negatively
7  "carry over into the workplace in terms of her general work
8  capacities, work stamina, and consistency of work performance."[104]

9      Without explanation, Dr. Jay interprets these findings as
10  saying that Faulkner's cognitive impairments were minimal.
11  Although Dr. Mekjian found, also without explanation, that
12  plaintiff was not "Temporarily Totally Disabled,"[105] he did not
13  indicate that her impairments were minimal or incidental.  To the
14  contrary, the litany of adverse effects and impairments Dr. Mekjian
15  described tend to establish disability, not to disprove it.

16              **3.  Hartford's Response to the UDC Reports**

17      The Administrative Record shows that Hartford did not afford
18  plaintiff a full and fair review of the denial of her benefits.
19  Indeed, such a review appears to be precluded by Hartford's
20  apparent mis-management of the appeal deadlines under which it
21  operated both by regulation and by its own self-imposed
22  limitations.  According to the Administrative Record, Hartford

---

23  [104] AR 346 (Dkt. No. 19-4).

24

25  [105] There is no explanation of what Dr. Mekjian means by
26  "Temporarily Totally Disabled," as that is not a term defined in
   the policy.

1    received plaintiff's administrative appeal on December 11, 2009.[106]

2    Including permitted extensions, Hartford faced a legal deadline of

3    March 11, 2011 to make a determination on the appeal (an original

4    45 day determination period after receipt of the appeal, plus a 45-

5    day extension).[107]  29 C.F.R. § 2560.503-1(i)(1)(I), 503-1(i)(3)(I).

6        The appeal was assigned to an appeals specialist, Jeff Jones,

7    who referred the matter to UDC on January 19, 2010.[108]  The referral

8    document does not advise UDC when its review should be completed.

9    However, the appeals specialist was later advised that any

10   decision granting benefits (that is, overturning the termination

11   of benefits) had to be made by March 8, 2011 (six months after the

12   initial termination of benefits) because otherwise plaintiff would

13   lose certain other benefits provided by PwC even if she received

14   the long-term disability benefits.[109]   To its credit, Hartford

15   thereupon acted pursuant to the shorter deadline, and notified PwC

16   that it would have its decision no later than March 8, 2010.[110]

17       On March 1, 2011, one week before Hartford's self-imposed

18   deadline for deciding the appeal, the appeals specialist asked UDC

19   ////

---

[106] AR 163 (Dkt. No. 19-2).

[107] The Administrative record shows that Hartford was aware of this deadline.  The appeals specialist assigned to the case clearly understood this, and so advised plaintiff in a letter setting forth the applicable deadlines.  AR 159 (Dkt. No. 19-2).

[108] AR 153-54 (Dkt. No. 19-2).

[109] Dkt. No. 36 ¶ 64; AR 149 (Dkt. No. 19-2).

[110] AR 149 (Dkt. No. 19-2).

1    for information on when its report would be completed.[111]   He was

2    advised that the UDC reviewers were working on it at that moment.[112]

3    The UDC reports were completed on the exact date of Hartford's

4    self-imposed deadline – March 8, 2010.[113]  This situation inherently

5    precluded the possibility of a full and fair review, unless the

6    reports were so obviously flawless that they raised no questions

7    and led inexorably to only one conclusion.[114]   The reports Hartford

8    received that day were nothing of the kind.

9         Indeed, Hartford, upon reading the reports, must have seen

10   their deficiencies and the other issues they raised.[115]   Most

11   notably, it would have noticed that neither doctor answered the

12   questions asked of them, that Dr. McQuillen's report completely

13   undermined Hartford's own disability findings over the prior eight

14   years, and that Dr. Jay's report severely criticized the report –

15   Dr. Mekjian's, the only one he was asked to review – that Hartford

16   relied upon in terminating plaintiff's benefits.   Yet, Hartford

17   adopted the report instantaneously, sending out its administrative

18

19        [111] Dkt. No. 36 ¶ 65; AR 148 (Dkt. No. 19-2).

20        [112] Dkt. No. 36 ¶ 65; AR 145 (Dkt. No. 19-2).

21        [113] Dkt. No. 36 ¶ 66; AR 127 & 138 (Dkt. No. 19-2).

22        [114] Hartford asserts that the March 8th deadline was
23   "irrelevant and immaterial."   Dkt. No. 36 ¶¶ 64 & 66.   To the
     contrary, it was crucial to Hartford's inability to provide the
24   "full and fair review" that it was legally obligated to provide
     Faulkner's appeal.

25        [115] At least, Hartford would have seen the problems if it had
26   taken any time to read the reports, rather than adopting them as
     soon as they were received.

1    denial before mid-afternoon of the same day both reports were

2    received, March 8, 2010.  There is no evidence in the record that

3    Hartford asked either doctor to explain their findings or their

4    failures to answer the questions asked of them, McQuillen's

5    rejection of Hartford's own "thorough review" of plaintiff's

6    medical records, or anything else.  The report came out Hartford's

7    way, and Hartford accepted it without any question or delay.[116]

8         Instead of questioning these obvious flaws, or rejecting the

9    reports because of them, the Hartford appeal determination simply

10   copied down the last two paragraphs of Dr. McQuillen's report, and

11   the last two paragraphs of Dr. Jay's report, and concluded that

12   based upon those reports, the appeal was denied.[117]  This is not the

13   consultation with health care professionals that Hartford was

14   required to conduct under the applicable regulations.  See 29

15   C.F.R. § 2560.503-1(h)(3)(iii) & (h)(4) (requirement to "consult"

16   with health care professional in determining appeals).

17        Meanwhile, the record contains overwhelming medical evidence

18   in support of plaintiff's underlying disability claim.  All of her

19   treating physicians found that plaintiff was disabled, as discussed

20   _____

21        [116] In addition, this is conduct that inevitably raises the
     question whether this conflicted administrator was just looking for
22   a way to terminate expensive, long-term disability benefits.  Even
     accepting all of Hartford's attempts to erect walls between the
23   financial people and the appeals section, this conduct is
     inherently suspicious, and justifies applying some skepticism to
24   the court's "abuse of discretion" standard.

25        [117] The rest of the determination letter itself simply
     recounted the history of the case and did not depend on the UDC
26   reports.

above.  Although, as noted, there was disagreement about what was causing the disability, they all agreed that she was disabled, and could not work 40 hours per week.  At most, Dr. Green found that she could possibly work 18 hours per week.

The record shows that she was not malingering – and Hartford makes no claim that she was.  To the contrary, the record shows that Faulkner tried to work or volunteer at every opportunity, but relapsed when she tried to do so.  Despite the overwhelming medical evidence of Faulkner's disability, and the complete absence of any evidence of any kind that she could work 40 hours – notwithstanding all the "independent" medical examinations and reviews Hartford purchased – Hartford terminated Faulkner's benefits.

The law requires that those benefits be restored.

**V.    CONCLUSION**

For the foregoing reasons

1.    Plaintiff's motion for summary judgment is **GRANTED**. Plaintiff is awarded retroactive benefits from the date of termination of her benefits to the date of this order, and reinstatement of her benefits going forward.  In addition, plaintiff may move for pre-judgment interest,[118] post-judgment

////

////

---

[118] See Blankenship v. Liberty Life Assur. Co. of Boston, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion").

interest  if  applicable,[119]  and  reasonable  attorneys'  fees  and

costs,[120] on a separate motion.

    2.   Defendant's motion for summary judgment is **DENIED**.

    IT IS SO ORDERED.

    DATED: March 15, 2012.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

    [119] <u>See</u> 28 U.S.C. § 1961(a) (post-judgment interest allowed on money judgment in civil cases); <u>Dishman v. UNUM Life Ins. Co. Of America</u>, 269 F.3d 974 (9th Cir. 2001) (addressing the date post-judgment interest begins to run).

    [120] 29 U.S.C. § 1132(g)(1).